**PINEHURST, INC., Pinehurst Driving & Training Club, Inc., and John Edmunds, d/b/a Edmunds Stable, Appellants,**

v.

**Sheila SCHLAMOWITZ, Appellee.**

**No. 9547.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 16, 1964.

Decided Oct. 6, 1965.

Arthur O. Cooke, Greensboro, N. C. (Cooke & Cooke, Greensboro, N. C., on brief), for appellant John Edmunds.

Daniel W. Fouts, Greensboro, N. C. (Mosley G. Boyette, Carthage, N. C., William J. Adams, Jr., Greensboro, N. C., Boyette & Brogden, Carthage, N. C., and Adams, Kleemeier, Hagan & Hannah, Greensboro, N. C., on brief), for appellant Pinehurst Driving and Training Club, Inc.

Stephen Millikin, Greensboro, N. C. (James Turner and Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., on brief), for appellant Pinehurst, Inc.

Charles F. Blanchard, Raleigh, N. C. (Yarborough, Blanchard & Tucker, Raleigh, N. C., and Sheila Schlamowitz, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BRYAN, Circuit Judge, and NORTHROP, District Judge.

HAYNSWORTH, Chief Judge:

The plaintiff sought recovery of the value of two race horses she owned which were destroyed when the barn in which they were stabled caught fire. The defendant Edmunds, a horse trainer, was the general bailee of the horses, and recovery of the other defendants was sought on the contention that they were co-bailees and, with Edmunds, were negligent in guarding against the risk of fire.

All three defendants have appealed from judgments entered upon a jury verdict. We reverse because we find no evidence of want of due diligence having a proximate relation to the loss.

The defendant Edmunds is a professional trainer of harness race horses. He accepts the general custody and care of horses owned by others, trains and exercises them and transports them from track to track in the East where he races them during the racing season. He stables the horses in Pinehurst, North Carolina in the winter months.

In the fall of 1961, the plaintiff purchased the second of two pacers. She delivered the two horses to Edmunds for care, training and racing, knowing that they would be wintered in Pinehurst. Through the winter of 1961-2, they were stabled in a modern horse barn, constructed of concrete blocks, owned by Edmunds, but on land owned by Pinehurst, Inc. At the conclusion of the 1962 racing season in New York state, they were returned to Pinehurst for the winter of 1962-3. That year, Edmunds had more horses in his care than he had stalls in his barn, so he leased half of a 14-stall barn owned by Pinehurst.[1] It was in this barn that plaintiff's horses were stabled, along with a race horse and a pony, owned by Edmunds, a race horse leased by his father, who was also a professional trainer, and two other horses owned by others for whom Edmunds was acting as trainer. There were also other horses in the possession of one Lewis, another professional trainer and the lessee of the other half of the 14-stall barn. This was the barn that burned early in the morning of January 4, 1963 with the loss of all of the horses stabled in it.

It is clear that Edmunds was a bailee of the plaintiff's horses, and was bound by his contract to return them or justify his inability to do so. We need not decide whether Pinehurst or the Driving Club, the lessors of the barn, could be classified as bailees of the horses Edmunds kept there, for we have concluded that the admitted bailee, Edmunds, has exonerated himself, and there is no evidence of independent negligence on the part of the lessors of the barn.

The plaintiff did not rest upon her prima facie case, established by proof of

---

1. Pinehurst, Inc. operates a winter resort. Among other things, it maintains three tracks, and on its land there were twenty-three horse barns, approximately half of which were owned by Pinehurst, the other half having been built by others and were owned by them.

Pinehurst Driving and Training Club, Inc. was a nonprofit corporation, organized and controlled by Pinehurst, to which Pinehurst leased its tracks, barns and related facilities. Edmunds was actually a sublessee, but, as the District Judge found that the Driving Club was the alter ego of Pinehurst, and entirely under its control, and as we find no negligence on the part of anyone, we may disregard the interposition of the Club.

delivery of the horses to Edmunds and his failure to return them. She went further and showed much of the circumstances surrounding and occasioning the loss. The defendants offered additional testimony, which with the plaintiff's evidence fully discharged the burden upon them to go forward. As a result, the story has been told as fully as it can ever be known, and there is no substantial contradiction in it. We are thus called upon to consider the evidence in the light of the plaintiff's specific claims of fault, (1) that no groom was asleep in the barn that night, (2) that there were no chemical fire extinguishers in the barn, and (3) that it was not equipped with an automatic fire alarm system.

Barn No. 4, the one leased half to Edmunds and half to Lewis, was some thirty to forty years old. It was of frame construction, and it had an earthen floor. At either end was a tack room. Edmunds used the one on the north end for the storage of hay, feed, harnesses and equipment, and the seven stalls he had leased were in the northern part of the building. Lewis occupied the tack room and the stalls in the southern part of the building.

There was no heat in Barn No. 4 and no means of producing a flame of any sort. Only two months before the fire, old wiring had been completely replaced with new. The floor was kept clean and free of debris, and it was hosed down every afternoon. There were spigots and water hoses in the barn and three large water barrels, with buckets, spaced one in the middle of the barn and one close to either end. There was a fire hydrant approximately seventy-five feet away. The services of a night watchman were provided by the lessor upon the subscription of Edmunds.

On the night of January 3–4, 1963, the night watchman made his usual rounds.

He punched a time clock in each barn on each round and flashed his light in each stall to see that the horse was not down or entangled. He checked Barn No. 4 some 25 to 35 minutes before the fire was discovered. Edmunds drove by sometime after midnight and saw nothing amiss. About 1:00 o'clock in the morning, however, the night watchman, from some distance away, saw flames in the center portion of the roof of the barn. Others saw the fire at about the same time and still others were awakened.

A number of people converged upon the barn and some attempted to enter the south end, while others sought entrance at the north end. Dense smoke thwarted their efforts. Waiting a moment or two after the doors were opened, the smoke lifted enough to enable Edmunds' father to crawl on hands and knees to the first stall, the one in which his leased horse was stabled. The horse was down. He retreated from the smoke. He thought he had heard one horse kicking near the south, or opposite, end of the barn, but the men at that end heard nothing but the crackle of the fire and assumed that all of the horses were down.[2]

Soon, a fire truck arrived, got water hoses going and put out the fire. The center portion of the barn and the roof had been burned out, however. The origin of the fire was never determined.

Before we examine the plaintiff's specific claims of fault against this factual background, we should advert briefly to the relevant legal principles as disclosed in the governing North Carolina cases.

 When there is a bailment for the mutual advantage of bailor and bailee, the bailee is required to exercise ordinary care for the preservation and protection of the goods.[3] He is not an insurer.[4]

---

2. There was testimony that, in the presence of dense smoke, a horse becomes frightened, his nostrils are distended, he inhales deeply and, after a few breaths, is suffocated.

3. Hanes v. Shapiro & Smith, 168 N.C. 24, 84 S.E. 33.

4. Dellinger v. Bridges, 259 N.C. 90, 130 S.E.2d 19; Morgan v. Citizens' Bank of Spring Hope, 190 N.C. 209, 129 S.E. 585, 42 A.L.R. 1299; Beck v. Wilkins-Rick Co., 179 N.C. 231, 102 S.E. 313, 9 A.L.R. 554.

He is required to exercise that degree of care which a person of reasonable prudence would use with respect to his own goods.[5] The fact that Edmunds stabled his own horse and pony in Barn No. 4, rather than in Barn No. 5 is not conclusive, for imprudent men may take imprudent care of their own property, but the fact may be relevant and, in some instances, persuasive.[6]

When the facts are not in dispute, it is for the court to apply the appropriate standard, unless the proven facts reasonably permit conflicting inferences as to the ultimate fact.[7]

When, of course, a bailor proves the bailment and a failure to return the goods, he proves a prima facie case, shifting the burden of going forward with the evidence to the bailee.[8] This is because the explanation usually is within the exclusive or primary knowledge of the bailee. However, the burden of persuasion never shifts.[9] Wherever the burden of going forward with proof may lie, the burden of persuading the finder of fact that the loss was due to the bailee's want of due diligence remains upon the bailor.[10] Thus, when a bailee discharges his duty of going forward, he may leave issues of fact which must be resolved by the fact-finder. His attempted exoneration may be so dependent upon the credibility of the evidence offered by him that the fact-finder must resolve the credibility issue under an instruction as to the result of the resolution of that issue. Or, the evidence of exoneration may be so independent of credibility issues that there is nothing left for submission to a jury.[11] This is such a case. It fails in the last category. Except that the origin of the fire is undetermined, there is no dispute as to the facts. What Edmunds did in the discharge of his trust, what the other defendants did, and what all defendants did not do, these things are not disputed. There is even agreement that the one big imponderable, the cause of the fire, is undetermined and undeterminable. The only real issues spring from differences as to inferences which might reasonably be drawn from the evidence that certain things were not done.

The first of these relates to the absence of a groom sleeping in the barn.

The plaintiff and her husband testified that they had observed that, during the racing season, grooms slept in tack rooms in horse barns at New York race tracks. There is no doubt of the fact. During the racing season, a groom is employed for every two horses. Since many races are

5. Trustees of Elon College v. Elon Banking & Trust Co., 182 N.C. 298, 109 S.E. 6, 17 A.L.R. 1205; Hanes v. Shapiro & Smith, 168 N.C. 24, 84 S.E. 33, at 36.

6. See Trustees of Elon College v. Elon Banking & Trust Co., 182 N.C. 298, 109 S.E. 6, at 9.

7. The division of functions between judge and jury is determined by federal, not state. law, Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953, but we see no difference in the two standards here.

8. Bennett v. Atlantic Coast Line R. Co., 232 N.C. 144, 59 S.E.2d 598; Wellington-Sears Co. v. Kerr Bleaching & Finishing Works, 231 N.C. 96, 56 S.E.2d 24; Falls v. Goforth, 216 N.C. 501, 5 S.E.2d 554; Swain v. Twin City Motor Co., 207 N.C. 755, 178 S.E. 560; Hutchins v. Taylor-Buick Co., 198 N.C. 777, 153 S.E. 397; Morgan v. Citizens' Bank of Spring Hope, 190 N.C. 209, 129 S.E. 585; Trustees of Elon College v. Elon Banking & Trust Co., 182 N.C. 298, 109 S.E. 6; Beck v. Wilkins-Rick Co., 179 N.C. 231, 102 S.E. 313; Hanes v. Shapiro & Smith, 168 N.C. 24, 84 S.E. 33.

9. Beck v. Wilkins-Rick Co., 179 N.C. 231, 102 S.E. 313, at 314.

10. Dellinger v. Bridges, 259 N.C. 90, 130 S.E.2d 19; Millers Mut. Ins. Ass'n of Illinois v. Atkinson Motors, 240 N.C. 183, 81 S.E.2d 416; Bennett v. Atlantic Coast Line R. Co., 232 N.C. 144, 59 S.E.2d 598; Morgan v. Citizens' Bank of Spring Hope, 190 N.C. 209, 129 S.E. 585; Beck v. Wilkins-Rick Co., 179 N.C. 231, 102 S.E. 313; Hanes v. Shapiro & Smith, 168 N.C. 24, 84 S.E. 33.

11. Herring v. Creech, 241 N.C. 233, 84 S.E.2d 886; Swain v. Twin City Motor Co., 207 N.C. 755, 178 S.E. 560; Morgan v. Citizens' Bank of Spring Hope, 190 N.C. 209, 129 S.E. 585.

at night, the grooms frequently are on duty at night. And when they are away from home, or have night duties, they may sleep in the tack rooms. Some usually do.

During the winter season, however, when there is no racing and no requirement of active night grooming, the standard is one groom for three horses. The grooms then have a normal duty period beginning at 7:00 o'clock in the morning and ending at 4:30 o'clock in the afternoon. If one of them is away from his home and has no other place to stay, he may sleep in a tack room. Such a one is there, however, because of his own convenience. At night, he has no duties. He is not required to be there. He may leave to visit with friends or to go off on any other frolic of his own. There are no restrictions upon him and no requirement of his presence. If he is there, asleep in a tack room, it is because he chooses to be there for reasons personal to him.

We need not speculate whether a sleeping groom in a tack room might have avoided the loss.[12] The fact is that no one in the business had thought that a sleeping groom in a barn such as this was a reasonable precaution against fire or other hazards. Their presence at night during the winter season was not because of any recognition of their usefulness. There was testimony that a conscientious groom, relieved of duty at 4:30 P.M., who had in his charge a horse who drank more water than most horses, might return in the late afternoon to replenish the water bucket. They were not required to do that, and the most conscientious of them did no more. A requirement of 24-hour groom service would have greatly increased plaintiff's maintenance costs.

Bearing in mind the fact that the duty Edmunds owed was one of ordinary, not extraordinary, care, we cannot affirm a finding of negligence because of his fail-

ure to take the possibly expensive and most extraordinary precaution of requiring the presence of a groom throughout the night.

The propriety of our conclusion is illustrated by the case of Morgan v. Citizens' Bank of Spring Hope, 190 N.C. 209, 129 S.E. 585. There, Morgan proved the delivery of some bonds to the bank and the bank's failure to return them. The bank introduced evidence that the bonds were stored in a safe-deposit box within a vault of usual construction, but had been stolen by a thief who had broken into the bank and had opened the vault with explosives. It was held there was no jury issue, for the burglary was not the result of any negligence of the bank. It is obvious, however, that if the bank had provided a night watchman, his presence might reasonably have been expected to have prevented the loss.

Though, conceivably, the presence of a sleeping groom in Barn No. 4 might have resulted in an earlier discovery of the fire, we conclude, in line with the Morgan case, that Edmunds' failure to arrange for the presence of a groom at night was not such a deficiency in the execution of his trust as to impose liability upon him.

For the same reasons, we must dismiss the contention that liability may be founded upon the absence of an automatic fire alarm system.

Two of the witnesses, who were horsemen, testified they had never seen a horse barn with such equipment. No other professional horseman testified to having seen or heard of one. The plaintiff, however, points to the testimony of William C. Sledge which she thinks creates a conflict.

Sledge had been employed by Pinehurst for approximately four years. He had general supervision of the operation of the greenhouses, the plumbing and heating department, the laundry and dry cleaning plant and a livery stable. For

12. A number of years earlier, another barn burned at Pinehurst. A groom was asleep in a tack room. All of the horses were destroyed. The groom managed to escape, but only with his underclothing.

the Driving Club, he also attended to the leasing of barns and stalls, and he had general supervision over maintenance of the tracks, company-owned barns and related facilities. He was not a horseman. His only acquaintance with horses was that he had derived from his work with Pinehurst.

During the course of a lengthy examination of Sledge about the barns, their maintenance and equipment, the following testimony was elicited:

"Q. Did you supply any fire alarm systems? Did your corporation supply any fire alarm systems to these barns?

"A. No, sir.

"Q. Are you familiar with any types of fire alarm systems?

"A. Yes. There are electrical systems.

"Q. They are well known in the horse trade?

"A. Right.

"Q. These systems are designed to give some warning when a fire breaks out?

"A. Yes. They are automatic. Certainly there are several types of automatic systems."

■ Plaintiff reads this as tending to prove that horse barns usually, or frequently, are equipped with automatic alarm systems. Standing alone, the affirmative answer to the question whether such systems were well known in the horse trade would support her. But the answer does not stand alone. It must be read in light of the fact that Sledge knew nothing of horse barns, except those at Pinehurst, and none of those were so equipped. It must be considered with the testimony of the professional horsemen-witnesses that had never known of a horse barn having such equipment. In view of the other testimony, otherwise uncontradicted, the answer may reasonab'y be understood as meaning only that the existence of such systems is known to horsemen, as to Sledge and, generally, to the public. The context of the one answer lends support to this reading of it.

■ We cannot read the testimony as a whole as providing a reasonable basis for a finding that a prudent horseman would have provided his barn with an automatic fire alarm system. Of course, had an effective alarm system been in place, there would have been assurance of earlier warning of the fire, but that fact cannot support a finding of negligence. In the Morgan case,[13] a burglar alarm system should have aborted the burglary, but the bank-bailee, nevertheless, was held entitled to pre-emptory instruction of exculpation.

■ Finally, the plaintiff contends that the defendants should have placed chemical fire extinguishers in the barn, rather than the three fire barrels and buckets. Such extinguishers were not unknown in horse barns. They were available in Edmunds' Barn No. 5, only a few feet away, but there was no attempt to use them in Barn No. 4, for the obvious reason that the people on the scene could not get to the fire.

The fire was in the center of the barn and had burned through the middle of the roof when first discovered. The barn was 188 feet long, and was so filled with dense smoke that no one could enter it. Had chemical extinguishers been inside the barn they could not have been reached, and, if reached, their contents could not have been sprayed upon the fire.

Moreover, by the time the would-be rescuers reached the barn and got the doors open, the horses were dead or dying. The most efficient fire-fighting apparatus could not have revived them.

There is no basis for a finding that the absence of chemical fire extinguishers in Barn No. 4 was a proximate cause of the destruction of the plaintiff's horses.

It thus appears that, the defendants having fully satisfied their burden of go-

13. Morgan v. Citizens' Bank of Spring Hope, 100 N.C. 209, 129 S.E. 585.

ing forward with the evidence and the facts being substantially undisputed, the record discloses no reasonable basis for a verdict in favor of the plaintiff. No one of the three deficiencies attributed by the plaintiff to the defendants, nor the three in combination, can afford a basis of recovery. The motion for a directed verdict should have been granted.

Reversed.