# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION AT NASHVILLE

_____

| | | |
|---|---|---|
| **BESS HARMON,** | ) | Maury County Chancery Court |
| | ) | No. 94-557 |
| Plaintiff/Appellee. | ) | |
| | ) | |
| VS. | ) | C. A. NO. 01A01-9607-CH-00344 |
| | ) | |
| **STEVE DUNN D/B/A BUD DUNN** | ) | |
| **AND SON STABLE**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| **And** | ) | |
| | ) | |
| **WILLIAM "TOBY" SCARBROUGH**, | ) | |
| | ) | |
| Defendant/Appellant. | ) | |
| | ) | |

**FILED**

**March 27, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

_____

From the Chancery Court of Maury County at Columbia.
**Honorable Jim T. Hamilton, Judge**

 **Alfred H. Knight**,
WILLIS & KNIGHT, Nashville, Tennessee
Attorney for Defendant/Appellant William "Toby" Scarbrough.


**William S. Fleming**, Columbia, Tennessee
Attorney for Plaintiff/Appellee.

OPINION FILED:

**AFFIRMED AND REMANDED**


**FARMER, J.**


**HIGHERS, J.** : (Concurs)
**LILLARD, J.** : (Concurs)

This is a breach of contract case involving the sale of a Tennessee Walking Horse known as "Phantom Recall."[1] The appellee, Bess Harmon, filed suit against the appellant, William A. "Toby" Scarbrough, after he stopped payment on a check tendered to Harmon for the purchase of the horse.[2] Significant here is the fact that within days of the tender, but prior to Scarbrough's physical receipt of the documents transferring ownership, the horse became critically ill and died. Thus, the issue is raised as to when the risk of loss passed. There are also secondary issues as to whether the horse's physical condition was materially misrepresented prior to the sale or whether the parties were operating under a mutual mistake of fact. The trial court entered a judgment for Harmon after a bench trial. For reasons hereinafter stated, we affirm.

The following evidence was presented at trial: Phantom Recall was a two year old stallion stabled at Bud Dunn and Sons Stable in Florence, Alabama in the fall of 1993 until its death on July 4, 1994. Steve Dunn was responsible for the general care (supplies and shoeing) of the animal and its training for and transport to various horse shows. Prior to its death, the horse had been shown in four separate events, with the last three occurring in June 1994.

During the last week of June 1994, discussions were had between Harmon and her husband, Dr. Roy Harmon, and Steve Dunn regarding the Harmons' desire to sell the horse.[3] Dunn began communicating with interested parties including Scarbrough and Jimmy McConnell.[4] There is some dispute regarding the exact content of these discussions, but for our purposes, it is important to know that on June 28, the Harmons instructed Dunn to sell the horse for a purchase price of $25,000. Through discussions with Dunn, the Harmons believed the buyer would be Jimmy McConnell.

---

[1]The certificate of registration identifies the horse as "Phanton's Recall." The transfer of ownership document refers to the horse as "Phantom's Recall." For purposes of this opinion, we will refer to the horse as did the parties in the trial of this matter.

[2]Harmon's suit as to Steve Dunn d/b/a Bud Dunn and Sons Stable was dismissed by the trial court and is not at issue on appeal.

[3]The record reflects that Mrs. Harmon owned the horse individually. The record also establishes that on June 27, Dr. Harmon and Dunn additionally discussed whether Mrs. Harmon could show the horse that week. Dunn did not wish to show the horse, stating that he had been working and showing him hard and that the horse had "a little cold."

[4]It is not disputed that Steve Dunn acted as an agent for the Harmons in negotiating the sale of the horse.

It was agreed that Dunn would bring a check for that amount to the Harmons' home in Columbia, Tennessee on the afternoon of June 30. The Harmons wanted to complete the transaction before leaving that day for vacation. When Dunn arrived that afternoon, he presented a check, dated June 29, 1994, in the amount of $25,000 to Dr. Harmon drawn on the account of Toby Scarbrough. The Harmons expressed surprise that the horse was not being purchased by McConnell, but nonetheless agreed to sell the horse to Scarbrough after assurances from Dunn that the check was good. Dunn indicated that he believed Scarbrough and McConnell were "buying [the horse] together."

A "transfer of ownership" document, dated June 30, 1994, was signed by Mrs. Harmon along with the colt's certificate of registration. Dunn, however, instructed Mrs. Harmon to leave the space for the buyer's name blank because Scarbrough had several accounts or businesses and Dunn was not certain which name he preferred to designate as owner. Mrs. Harmon also paid Dunn his commission on the sale.

That evening Dunn saw Scarbrough at a horse show in Lewisburg, Tennessee. Dunn described their meeting as follows:

> Q. Did you have a conversation with Mr. Scarbrough about this horse sale?
>
> A. We seen each other for a little while. . . . And I just told him that I'd been by there and give them the check and everything.
>
> Q. Did you deliver the horse papers to him at that time?
>
> A. No, I didn't.
>
> Q. Did he ask you for them?
>
> A. No, he didn't.
>
> Q. Was there any reason that you just didn't deliver them on that time?
>
> A. I just had them laying on my dash and just didn't think about it.

On the following evening, July 1, the two met again at another equestrian event where, according to Scarbrough, Dunn informed him that "he had the paper work and all those

things." Dunn further testified:

> Q. Was there any reason, Mr. Dunn, that on the night of June the 30th at Lewisburg or on the night of July the 1st at McMinnville, when you saw Mr. Scarbrough both of those nights, that you could not have given him the papers?
>
> A. I didn't even think about it. . . .
>
> Q. Did he ever ask you for the papers on either of those nights?
>
> A. I don't remember.
>
> Q. Did he know you had the papers?
>
> A. Yes.
>
> Q. You had told him that?
>
> A. Yes.
>
> Q. Did he know you had delivered the check?
>
> A. Yes.
>
> Q. He knew the horse was at your barn?
>
> A. Yes.

As noted, the horse subsequently died on July 4 from colitis.[5] Scarbrough stopped payment on the check representing the purchase price the following day. The Harmons returned from their vacation on July 9 to discover that the horse had died.

Other testimony in the record indicates that an agreement existed between Scarbrough and Jimmy McConnell that they, along with the latter's brother, Jackie, would purchase the horse, with each owning a one-third interest. Jimmy McConnell testified that he informed Scarbrough that, if the latter could purchase the horse for around $25,000, he would be interested in going in with him. He stated that their agreement to this effect became "firm" on July 1. On this date, at the McMinnville horse show, Scarbrough informed Jimmy McConnell that he had given a check to the Harmons. It was at this time that Scarbrough told Dunn that the horse would be transported to another stable (Jimmy's or Jackie's) on July 5.

---

[5]The final pathology report indicates the specific cause of death as "severe, diffuse hemorrhagic colitis."

There is also testimony regarding a conversation between Dunn and Scarbrough on the morning of June 30, when Dunn approached Scarbrough for the check for the purchase price. According to Dunn, he informed Scarbrough at the time that the horse "had a cold, but [he] thought he was alright." Scarbrough testified that Dunn told him that the horse "had a cough and that [Dunn] thought he was going to be fine."

The veterinarian who treated Phantom Recall was Dr. Jennifer Jubb. She testified by deposition that she was initially called to treat the horse on June 25, 1994 because he was not eating well and had a cough. Jubb's examination indicated that the horse had a fever of 105.6 degrees.[6] The colt's physical examination was "within normal parameters" but his pulse and respiration were "elevated." He was "huffing to breathe." Jubb treated the horse with medication for a respiratory virus. She next saw the horse the following day, June 26, to administer his medication. At this time, the colt was "slightly brighter." Jubb stated, "[h]is temperature had come down considerably. He was down to 102.6 . . . pulse and respiration [I] was happy with at that point. Temperature . . . is nothing to be really worried about." She instructed Dunn Stables to continue the horse's medication for seven days. On June 27, Jubb phoned Dunn Stables and was informed by an employee that the horse was "much better" and was eating and drinking.

Jubb was next called to treat Phantom Recall on July 3. She found the horse upon examination to be "cold, sweating, severely depressed" and dehydrated. It had a temperature of 105.2 degrees, "critically balanced electrolytes" and kidneys that were not functioning properly. The colt was transported to the veterinary hospital. Its prognosis was "extremely grave."

Jubb was questioned regarding how long she thought the horse had been ill as of July 3, to which she answered:

> I would say per acutely . . . Acute means very quickly, . . . and per acute is even faster than that. . . . how I base that is that . . . his body temperature, was still extremely high; which with horses with colitis -- which just means an inflammation of the colon . . . . if they have a temperature of 105 they're way at the first part of it. That goes away in a number of hours, sometimes even just a few hours,

---

[6]Jubb testified that normally the horse's temperature at rest would be 100 to 101 degrees.

when they start getting endotoxic, and then their temperature just bottoms out . . . . So I would say the horse was found very early in it.

These horses can go from okay to dead in very few hours . . . . six hours is not unusual with these horses that are acutely endotoxic.

Jubb stated that her conclusion in this regard was supported by her laboratory work on the animal. She confirmed that she treated another horse (Pushover Madeover) at the Dunn Stables on June 25 for respiratory problems that also died from colitis on July 4.

Jubb did not have a "definitive diagnosis" as to the "mediator" of the colitis, stating that "[i]t can be caused by a lot of different things . . . and it can be precipitated by -- in some horses that are real nervous type horses anyway, big changes in environment can be enough to cause them to have colitis. But most often, . . . it's a stress or concurrent illness."[7]

She was further questioned:

Q.     Dr. Jubb, the last time you saw Phantom Recall on June the 26th, 1994, the horse was doing fine?

A.     No, he was sick.

Q.     He had a cold; a slight cold?

A.     No.

. . . .

A.     My comment, I believe, was that he was responding very well with no apparent problems. Responding very well and not being sick are two totally different things, okay?

Q.     The horse had no severe disease at that time, or acute problems?

A.     . . . . He was still in that acute disease state, but he was responding well, which means that the respiratory problem was apparently rectifying, which is why I use the word apparently doing

---

[7]The pathology report on the animal indicates that acute colitis has several causes: Salmonella, a diagnostic umbrella called Colitis-x and Potomac Horse Fever. It continues, in part, that animals are reported to develop Colitis-x after stressful times, such as illness and that the mortality rate for Colitis-x is reported to be 90%.

well.[8]

. . . .

Q.      When you saw the horse on July the 3rd, . . . the horse was acutely ill with symptoms that were not present the last time you examined the horse on June 26, 1994.  That is correct; isn't it?

A.      That is correct.

. . . .

Q.      Could that horse have had colitis three days before on June the 30th and still be alive on July 3rd?

. . . .

A.      I do not believe that a horse could have clinical colitis on the 30th of June and just be showing per acutely clinically ill on July the 3rd.  I cannot say with even a reasonable degree of certainty that factors were not present in the horse on 30 June that could have caused him to have colitis on 3 July.

. . . .

A.      I have laboratory test that supported my respiratory diagnosis and I have laboratory tests that support my colitis diagnosis, and it is accepted veterinary medical information that any systemic illness can be a predisposing factor to colitis.

Q.      There's a difference in my mind as between causing something and predisposing an animal to be susceptible to a disease.  Do you agree with that?

A.      I will agree with that.


There was also testimony from a second veterinarian, Dr. Randall Baker, who reviewed Jubb's deposition and the medical records of Phantom Recall to conclude that the horse died with "symptoms you would expect to see with colitis-x."  Baker described colitis-x as a disease having a "very fast progression; a horse, from appearing normal to death, twenty-four to forty-eight hours, usually."  He further testified:

Q.      [D]o you have an opinion as to whether or not Phantom Recall, on June 30th, 1994, based upon a reasonable degree of medical certainty or veterinary certainty, had colitis or colitis-x on that date?

A.      Again, you have a twenty-four to forty-eight hour progression of the entire disease in most cases.  So on June the 30th, if this horse

---

[8]Jubb testified that she believed the horse remained sick on June 30, explaining that she had prescribed a week's worth of antibiotics.

had been sick then with colitis, he would certainly have been noticeably ill at that time. It's not something that would take him three or four days to develop.

Q.      Could the horse have lived, in your opinion, to July the 4th?

A.      There is that possibility. But he would have certainly been ill on June the 30th, if he had colitis at that time.

Q.      What is the probability of a horse with that living till July the 4th, if he had it on June the 30th?

A.      Ten percent, probably.

After hearing the evidence, the trial court ruled as follows:

[T]he court finds that the Harmon's [sic] and Mr. Scarbrough entered into a valid and binding contract for the sale of Phantom Recall for $25,000.00. The parties reached an agreement by a meeting of the minds for Scarbrough to purchase and Harmon's [sic] to sell Phantom Recall for the sum of $25,000.00. The only part of the agreement which was not completely clear to the Harmon's [sic] was that they thought the horse would be sold to Jimmy McConnell, but they agreed to sell the horse to Defendant Scarbrough. Steve Dunn was the agent of the Harmons's [sic], accepted Scarbrough's check for $25,000.00 and delivered it to the Harmon's [sic]. The Harmon's [sic] then transferred title to the horse by signing the transfer papers. The fact that the name of the new owner was left blank on the transfer papers is of no consequence to this transaction. The Harmon's [sic] accepted the check and deposited it in their bank. The deal was complete. The risk of loss passed at the conclusion of sale. The court further finds that neither the Harmon's [sic] nor their agent knew that the horse was sick other than having a cough which the horse had on or about June 27, 1994, and this information was given to Defendant Scarbrough.[9]

Appellant frames the issues on appeal as follows:

1. When an agreement for the purchase of a horse is entered into, and a check for the purchase price is given to the seller and transfer papers are signed by the seller, but the horse dies before it or the papers are delivered or tendered for delivery to the purchaser, has the risk of loss passed to the purchaser making him liable to the seller for the purchase price?

2. Does a person who enters into a contract for the sale of a horse make material misrepresentations of fact sufficient to justify rescission of the agreement, when her agent tells the purchaser that the horse "has had a cough, but is alright", notwithstanding the agent's knowledge that the horse had had a high fever, an elevated

---

[9]A judgment was entered for Harmon for $29,800.66.

pulse, had been diagnosed as having a respiratory infection, and was currently being treated with anti-viral and anti-biotic drugs?

3. When parties are unaware that a horse which is the subject of a contract of sale has a medical condition at the time the contract is entered into, that later causes it to contract colitis and die, is there a mutual mistake of material fact regarding the subject matter of the contract which justifies its rescission?

As to the first issue, our attention is directed to the Uniform Commercial Code - Sales, T.C.A. § 47-2-101 *et seq*., which expressly applies to "transactions in goods." T.C.A. § 47-2-102. The passing of the risk of loss in the absence of breach is covered under § 47-2-509. It states, in part pertinent:

> **Risk of loss in the absence of breach**. . . .
> (2) Where the goods are held by a bailee to be delivered without being moved, the risk of loss passes to the buyer:
> (a) on his receipt of a negotiable document of title covering the goods; or
> (b) on acknowledgment by the bailee of the buyer's right to possession of the goods; or
> (c) after his receipt of a non-negotiable document of title or other written direction to deliver, as provided in § 47-2-503(4)(b).
> (3) In any case not within subsection (1) or (2), the risk of loss passes to the buyer on his receipt of the goods if the seller is a merchant; otherwise the risk passes to the buyer on tender of delivery.

The parties to this action dispute whether Dunn was a bailee for purposes of the statute. Scarbrough asserts that no bailor-bailee relationship existed between Harmon and Dunn and that resolution of the issue entails consideration of subsection (3). Under Scarbrough's construction of subsection (3), the risk of loss remained on the "merchant" seller, Mrs. Harmon, because he never actually received the horse. Alternatively, it is argued that in the event Mrs. Harmon is not considered a "merchant" by this Court, the risk of loss nonetheless remained with the seller as there was no tender of delivery. Harmon, of course, takes the contrary position that Dunn was a bailee at all times material and that the risk of loss passed to Scarbrough pursuant to subsection (2)(b).

The trial court made no express finding regarding the status of Dunn; however, upon review of the record we find it to support only one conclusion -- that a bailor-bailee relationship existed between Mrs. Harmon and Dunn. A bailment is defined as "a delivery of personalty for a

particular purpose or on mere deposit, on a contract expressed or implied, that after the purpose has been fulfilled, it shall be re-delivered to the person who delivered it or otherwise dealt with according to his direction or kept until he reclaims it." *Merritt v. Nationwide Warehouse Co.*, 605 S.W.2d 250, 252 (Tenn. App. 1980). A bailor-bailee relationship is ordinarily created by delivery and acceptance and consent or agreement of the parties; however, it may also result from the actions and conduct of the persons regarding the goods in question. Where there is no express contract, the creation of a bailment requires that possession and control pass from bailor to bailee; there must be full transfer, actual or constructive, so as to exclude the property from possession of the owner and all others and give the bailee sole custody and control for the time being. *Merritt*, 605 S.W.2d at 253.

As further explained by the Oregon Court of Appeals in *Dundas v. Lincoln County*, 618 P.2d 978 (Or. Ct. App. 1980):

> In the distinction between bailment, or possession, and mere custody, . . . the element of intent to control and possess plays the leading part. Where the owner of goods places them in the actual physical control of another but does not intend to relinquish the right, as distinct from the power, of dominion over them, there is no bailment or possession but only a mere custody.

*Dundas*, 618 P.2d at 982-83 (quoting *Jackson v. Miller*, 598 P.2d 1255 (1979)). In 3A C.J.S. *Animals* § 47 (1973), it is stated: "[d]elivery of animals pursuant to a contract of agistment, . . . or similar contract to keep and care for the animals constitutes a bailment of the animals." Accordingly, in *Presley v. Cooper*, 284 S.W.2d 138, 140 (Tex. 1955), it was held that where the plaintiff contracted with the defendant to train, feed and care for the plaintiff's horses for a fee, their relationship was one of bailor and bailee. *See also Pinehurst, Inc. v. Schlamowitz*, 351 F.2d 509, 511 (4th Cir. 1965) (bailor-bailee relationship clearly existed where defendant, professional trainer of harness race horses, accepted general custody and care of plaintiff's horses, trained and exercised them and transported them from track to track racing them).

We conclude that the facts before us clearly establish a bailor-bailee relationship between Harmon and Dunn. It is not disputed that the latter was the agent of the former. "A bailee has been said to be a species of agent." 8 C.J.S. *Bailments* § 3 (1988). Here, it was agreed that

Dunn would train and care for Phantom Recall at the Dunn Stables in Florence, Alabama. He was also responsible for transporting the horse to various shows. The record establishes that prior to the horse's death, he had been entered and shown by Dunn himself in three separate events. In a fourth event, he was shown by Mrs. Harmon. However, the record makes clear that on June 27 when the Harmons wanted to show the horse, they first made inquiry to Dunn and it was Dunn who made the decision that the horse should not be shown. Clearly, Dunn had a right of dominion over the animal.

"Goods are not 'moved' for the purposes of allocation of risk under [§ 2-509(2)] where they remain in the physical possession of the bailee at the facility where they were stored." 77A C.J.S. *Sales* § 228 (1994). The record lends no indication that Scarbrough intended that the horse be moved or delivered elsewhere upon its purchase from Harmon. It was Dunn's testimony that prior to June 30, Scarbrough had made no arrangements with him regarding stabling the horse. However, there is nothing in the record suggesting that Scarbrough himself would have desired to relocate the horse to a different stable. The record establishes that Scarbrough is also a resident of Florence, that he and Dunn were long time friends and that Dunn had stabled "several" horses for him in the past. In any event, Scarbrough testified that there were no other discussions with Dunn regarding the horse's relocation except that occurring at the McMinnville horse show on July 1.

We further note that although the testimony of Scarbrough indicates that the horse was originally to be purchased from the Harmons three ways, by the McConnell brothers and Scarbrough, it was actually Scarbrough alone who initially purchased the animal, as the check drawn on his account was written for the entire purchase price. Thus, any later agreement or arrangement with the McConnells, including the horse's transportation to another stable on July 5, constitutes a separate and distinct transaction from the one occurring with the Harmons. The record is clear that it was only after Scarbrough was informed that Dunn had the transfer papers in his possession and Scarbrough's entering into a separate and subsequent agreement with McConnell that he informed Dunn that the animal was to be moved elsewhere.

Having established Dunn a bailee for purposes of § 47-2-509(2) and in the absence of any prior arrangement with Dunn or Harmon that the horse be delivered elsewhere upon purchase from the latter, we find that the risk of loss passed to Scarbrough if and when the applicable

provisions under subsection (2) occurred. Subsection (2)(a) and (b) provide that the risk of loss passes to the buyer "on his receipt of a negotiable document of title covering the goods; or on acknowledgment by the bailee of the buyer's right to possession of the goods." The proof shows that Scarbrough was actually made aware that the Harmons had received his check and that Dunn had the transfer documents no later than July 1. Thus, Dunn, as bailee, acknowledged Scarbrough's right to possession at this time. This is evidenced by the fact that Scarbrough thereafter proceeded to sell an interest in the horse to the McConnells and arrange for the horse's transportation to another stable.

Scarbrough, however, asserts that (2)(b) does not apply where there are ownership papers to be transferred to the buyer. On this issue we quote from 3A Richard W. Duesenberg & Laurence P. King, ***Bender's U.C.C. Service*** § 8.03(1)(b)(1996) as follows:

> Subsections (2) directs itself to the case of a documentary transfer or any other situation where the goods are in the hands of a bailee, presumably other than the seller, and are to be delivered without being moved. . . . Three principal situations are possible. The first two are where the goods are covered by documents, either negotiable or nonnegotiable. And the third is where the goods are in the hands of a bailee, but are not covered by any documentary form.
>
> In the case of a sale of goods covered by negotiable documents of title, risk passes on the buyer's receipt of the document. . . . it is clear under the risk of loss provision that risk does not shift until after the document is actually received by the buyer. Here, as elsewhere when the term "receipt" is used, a physical possession is what is contemplated. . . . In either case, that is, with either a negotiable or a nonnegotiable document, if the bailee refuses to honor the document, the tender is defeated and under Section 2-509(2)(c), the risk remains with the seller.

According to the authors, the buyer's actual receipt is required in order to effectuate the intended purpose of the Code which is "to shift the risk of loss when the buyer has received the ability to control the possession of the goods." It is reasoned that "[i]n the case of negotiable documents, this occurs when he receives the document from the seller, since without it, no one should be able to procure the goods from the bailee."

Notwithstanding the foregoing, we find that under this particular set of facts, Scarbrough received the ability to control possession of the horse no later than July 1 irrespective of the fact that he did not actually receive physical possession of the ownership documents at that

time. The documents which were necessary for transfer of ownership and taking possession of the horse were already in the hands of the bailee. As of the evening of June 30, Dunn was under express instructions from Harmon that the horse be sold to Scarbrough. Dunn was given the transfer documents signed by Harmon to deliver to Scarbrough. Scarbrough was made aware that Dunn had the necessary papers for transfer of ownership. Thus, Scarbrough was capable of "procur[ing] the goods" from Dunn, and actually took steps to do so on July 1. The actual papers needed for Scarbrough to take possession of the animal remained with the person to whom presentment would be necessary to procure the goods (Phantom Recall). We find an actual physical back and forth exchange between the two unnecessary under these facts where the bailee and the seller's agent are one and the same. Certainly Scarbrough had the ability to control possession of the horse no later than July 1 when he was made aware that Dunn had the transfer papers and Dunn's limited instructions when he left the Harmon home on June 30 were to sell the horse to Scarbrough.

Scarbrough next argues that he is entitled to rescind the agreement with Harmon because of material misrepresentations made by Dunn regarding the horse's condition at the time of sale. Specifically, Scarbrough asserts that Dunn's statement on June 30 that the horse had a cough, but was alright was "false and misleadingly incomplete." We are inclined to agree with the trial court that material misrepresentations were not made in this matter. Neither veterinarian could say with a reasonable degree of medical certainty that the colitis was present in the horse on June 30 or July 1. Although clearly the record suggests that the horse's respiratory infection was a predisposing factor to the later development of colitis, there is no testimony that it caused the colitis. The horse initially responded well to Jubb's treatment. The severe symptoms associated with the disease did not appear until July 3. Both doctors agreed that a horse can die within hours of contracting the disease. Dr. Jubb's testimony was that when she treated the horse on July 3, he was in the early stages of the illness. Moreover, Dr. Baker stated that if the horse had colitis on June 30, it would have been "noticeably ill." Dunn Stables did not contact Jubb regarding the severity of the horse's symptoms until July 3.

We therefore conclude that Dunn's statement to Scarbrough was not false. The record does not indicate that one should have reasonably foreseen on June 30 that the horse's condition would subsequently worsen and it would contract a fatal disease. Granted, a thorough explanation

of the horse's recent medical treatment was not divulged; however, we find that the information conveyed was sufficient to establish that the horse on June 30 was less than "100%" and to put Scarbrough on inquiry notice. Scarbrough testified that he knew that he had a right to a prepurchase examination of the horse and had required such with prior purchases. Generally, a party dealing on equal terms with another is not justified in relying upon representations where the means of knowledge are readily within his reach. *Solomon v. First Amerian Nat'l Bank*, 774 S.W.2d 935, 943 (Tenn. App. 1989).

Finally, as to the last issue posed, we do not find the facts to establish that the parties were operating under a mutual mistake of material fact. It is argued that "the horse's potentially fatal condition was a mutual mistake regarding a fact that was material to the transaction." Under the proof, however, it cannot be said that the condition of colitis, which is potentially fatal and proved to be in this case, existed in the horse until July 3.

It results that the judgment of the trial court is affirmed and this cause remanded for any further proceedings herewith consistent. Costs are assessed against the appellant, for which execution may issue if necessary.

 

_____
FARMER, J.

_____
HIGHERS, J. (Concurs)

_____
LILLARD, J. (Concurs)